UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                        Case No. 22-cr-20459

v.                                    HON. MARK A. GOLDSMITH

RONALD EDWARD ROBINSON, JR.,

    Defendant.
_____/

**OPINION & ORDER**
**GRANTING IN PART & DENYING IN PART DEFENDANT'S MOTION IN LIMINE**
**(Dkt. 33)**

This matter is before the Court on Defendant Ronald Edward Robinson, Jr.'s motion in limine (Dkt. 33). Robinson seeks to exclude the Government's proposed expert testimony of Detroit Police Department (DPD) K-9 Officer Steven Brandon. For the reasons set forth below, the Court grants in part and denies in part the motion.[1] The Court permits Brandon to testify consistent with the Government's second revised expert disclosure (Dkt. 56), and it overrules Robinson's objections (Dkts. 55, 57).

**I. BACKGROUND**

Robinson is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Indictment (Dkt. 12). According to the Government, on August 18, 2022, DPD officers

---

[1] In addition to the motion, the briefing includes the Government's response (Dkt. 34), the proposed findings of fact and conclusions of law submitted by Robinson and the Government (Dkts. 37, 42), the Government's notice of revised expert disclosure (Dkt. 54), which it filed pursuant to the Court's order directing the Government to clarify Brandon's proposed opinion (Dkt. 52), the Government's second revised expert disclosure (Dkt. 56), and Robinson's objections to the Government's revised expert disclosures (Dkts. 55, 57). The Court held hearings on the motion on May 1 and May 22, 2023.

observed Robinson standing in the street and leaning into the driver's window of a stopped car. Resp. at 5. Upon seeing the patrol car, Robinson leaned back out of the window, grabbed at his waist, and ran up the driveway and into the backyard of 19355 Archdale Street. Id. Officers Mabson and Jones pursued Robinson on foot, chasing him through the backyard and over a fence, while Officer Jones drove his vehicle to Fenmore Street. Id. As Robinson cleared the fence that divided the backyards between Archdale and Fenmore Streets, the pursuing officers lost sight of him. Id. They ultimately found Robinson hiding in a yard on Fenmore Street. Id. The officers arrested Robinson. Id.

Sometime later, K-9 Officer Steven Brandon and his canine partner, Ares, arrived at 19361 Archdale Street. Initially, Brandon and Ares were responding to the scene of an unlocated suspect in a foot pursuit between Archdale and Fenmore Streets—i.e., the pursuit of Robinson. Hr'g Tr. at 28 (Dkt. 36). Before arriving, the pursuing officers reported that they had Robinson in custody, but Brandon continued to the scene because he expected that the officers would request that he and Ares conduct an article search. Id. at 68.

When he arrived at the scene, Brandon spoke to Officer Biggs, who stated that the officers were trying to find a firearm. Id. at 68. Biggs led Brandon up the driveway where Biggs believed he had started the foot pursuit and lost sight of Robinson. Id. at 22. According to Brandon's report, however, Biggs led Brandon and Ares up the driveway of 19361 Archdale Street, the lot next to 19355 Archdale Street—where the pursuit in fact commenced. Brandon Police Report (Dkt. 33-1). Brandon gave Ares a command to start the article search. Hr'g Tr. at 73. Ares started to move, but, about three to four yards and a few seconds later, he came to an abrupt stop and snapped his head left toward a fence that ran along the backyard of 19355 Archdale Street. Id. at

73–74. Ares went up to the fence and started digging. Id. at 74. Brandon looked over the fence, into the backyard of 19355 Archdale Street, and saw a firearm on the ground. Id.

The Government intends to introduce expert testimony from Brandon regarding his knowledge, skills, education, training, and experience in canine handling procedures and his employment of Ares in the article search and firearm recovery on August 18, 2022. Gov't 2d Revised Expert Notice at 2. His testimony will include "the conditions that affect and how long the human scent generally remains on articles, including a gun." Id. Brandon will assert that "K9 Ares's actions—recorded on Officer Brandon's body camera—which include an article search lasting only seconds and a near direct route to the recovered firearm—indicate that, when K9 Ares alerted to the firearm, the firearm had not been present in the backyard of 19355 Archdale for more than four-and-a-half hours from the time human scent/odor/tissue was deposited onto the article." Id. Further, Brandon will testify that, based on his training and experience, "complicating factors such as the passage of time, weathering, or contamination would have extended the duration of the article search and that the short duration and direct route K9 Ares took are indicative of an absence of those factors." Id. Finally, he will testify that its relatively "clean" state and lack of discoloration lead him to conclude that the firearm had not been "exposed to outdoor conditions" for more than the four-and-a-half hour period. Id.

## II. ANALYSIS

The Government—the proponent of Brandon's expert testimony—bears the burden of proving its admissibility by a preponderance of the evidence. Id. at 593 n. 10. Robinson argues the Government has not met its burden of establishing that Brandon's testimony is reliable and relevant. He contends that, under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Federal Rule of Evidence 702, the Court should exclude the proposed testimony

3

because the Government has not shown that Brandon's methodology or experience is reliable as applied to his opinions on firearm detection, how long the human scent remains on a firearm, or whether the weapon was present at a particular place for a particular length of time. Mot. at 9–10. Robinson also contends that, under Rules 401, 402, 403, and 702, the Court should exclude the testimony because any relevance is substantially outweighed by the danger of unfair prejudice. Id. at 13–15.

The Court finds that Brandon may testify in accordance with the Government's Second Revised Notice. The Government has met its burden in demonstrating that such testimony is reliable and relevant, and the testimony does not pose a risk of unfair prejudice. However, Brandon cannot offer an opinion that the firearm had "recently" been handled or that there was "fresh" human odor detectable by Ares on the firearm—as he had initially proposed to do, see Initial Notice (Dkt. 54-2)—because the danger of confusing or misleading the jury substantially outweighs any probative value of that testimony.

**A. Reliability**

Rule 702 permits a qualified expert to opine on any technical, scientific, or other specialized matter that will help the jury understand evidence or determine a fact in issue "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The United States Supreme Court has stated that the district court must play a gate-keeping function in deciding whether to admit or exclude expert testimony, ensuring "that any and all scientific testimony or evidence admitted is not only relevant but reliable." Daubert, 509 U.S. at 589; see also United States v. Harris, 192 F.3d 580, 588 (6th Cir. 1999) (explaining that Daubert's relevance and reliability analysis applies to all evidence offered under

Rule 702, including when the Government offers a law enforcement officer to testify as an expert in criminal cases).

The Supreme Court has set forth factors that courts can consider in assessing an expert's reliability, which include: (i) whether the underlying technique can be and has been tested; (ii) whether the technique has been subjected to peer review and publication; (iii) the known or potential rate of error; (iv) the existence and maintenance of standards governing the technique's operation; and (v) whether the technique is generally accepted in the relevant expert community. Daubert, 509 U.S. at 593–594. "'The test of reliability is 'flexible,' and the Daubert factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case.'" In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 119 (1999)).

In considering the Daubert factors, the Court finds that the Government has met its burden of proving that Brandon's testimony is sufficiently reliable.

The underlying technique of the article search that Brandon and Ares conducted on August 18, 2022 can be and has been tested, is maintained according to industry standards, and is generally accepted in the relevant expert community. The article search is part of an industry-standard curriculum for canine handlers. 5/1/23 Hr'g Tr. at 31, 34. Brandon and Ares have been trained, tested, and certified to conduct article searches by the National Association of Professional Canine Handlers (NAPCH). Id. at 36. NAPCH employs industry-standard training and certification criteria for canines and their handlers. Id. It also uses uniform testing criteria, and its standards and certifications are accepted as best practices for the canine-handling field. Id. at 38–39. The NAPCH article search test is a "comprehensive evaluation of the [canine] team's ability to locate items that have recent human odor on them." Id. at 35. A canine must locate at least three of four

5

articles during NAPCH article search certification testing. Id. at 51–52. Ares has a 100% rate of locating items during this type of testing. Id. Brandon and Ares are annually certified by NAPCH as a patrol narcotics canine team, which encompasses narcotics, obedience, tracking, article searches, building and area searches, and aggression. Id. at 38–39.

While Brandon's use of Ares in conducting article searches has not been published in a peer-reviewed journal, Brandon evaluates Ares's effectiveness at article searches weekly, and he and Ares are certified annually by experienced canine-handler trainers and master trainers. Id. at 35–36. The training and testing logs that Brandon maintains, which note successful and unsuccessful article searches in controlled environments and the conditions of those searches, are comparable to known error rates. Gov't Hr'g. Ex. 2.

Since 2020, Brandon and Ares have conducted over 200 article searches in a variety of conditions through training, testing, and on-the-job performance. 5/1/23 Hr'g Tr. at 59. Brandon explained that, in an article search, a canine attempts to locate an object that is emitting "fresh human odor." Id. at 43–44. Thus, the article search is a function of a canine's superior ability to detect the scent of fresh human biological tissues—such as skin, sweat, or saliva—deposited on objects. Id. at 43–44. Brandon also explained that certain conditions—location, the passage of time, weather, and levels of human contamination—impact how effective a canine is at detecting fresh human scent. Id. at 46. He stated that, for example, rain, wind, sun, human odor, human traffic through an area, and increases in the length of time between when an article is discarded to when a search is conducted can all make an article search more complex or longer in duration. Id. at 46–48. Through approximately eight hours of weekly training with Ares, Brandon replicates real-world search conditions and uses different locations, weather conditions, and levels of contamination to develop Ares's ability to locate articles. Id. at 54. He testified that, through these

6

searches, he has become familiar with Ares's physiological signs and the impact of various complicating factors on Ares's effectiveness in locating articles. Id.

The longest period of time between when "human scent/odor/tissue was deposited onto [an] article" and when Ares has successfully found that article is four-and-a-half hours. Gov't 2d Revised Disclosure at 2; see also id. at 63–65.

The Government has shown that Brandon's testing, training, and experience create a sufficiently reliable foundation for the opinions he proposes to offer in this case. See United States v. $ 307,970.00 in U.S. Currency, No. 4:12-cv-136, 2019 WL 2173432, at *7 (E.D.N.C. May 20, 2019) (finding that opinion testimony that canine alerted to the presence of drugs in car and on currency in car was sufficiently reliable based on canine's certification, test results, field performance, and circumstances surrounding the alert).

Robinson contends that Brandon's subjective opinions of Ares's performance are inconsistent with the actual results of Ares's performance. Def. Proposed Findings at 6. He points to two entries in Brandon's training logs that show that on August 17, 2022 and August 18, 2022, Ares was unsuccessful at locating items in searches conducted as part of Ares's training. However, given that Brandon's testimony has a reasonable factual basis, "any remaining challenges merely go to the weight, as opposed to the admissibility, of the expert testimony." United States v. Ramer, 883 F.3d 659, 680 (6th Cir. 2018); see also Mitchum v. City of Indianapolis, 534 F.Supp.3d 1001, 1007 (S.D. Ind. 2021) (explaining that attacks on overall strength of opinion of expert in canine training and evaluation was not grounds for exclusion but rather could be raised by defendants at trial).

**B. Relevance**

Only relevant evidence is admissible. See Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Even relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence." Fed. R. Evid. 403. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." United States v. Newson, 452 F.3d 593, 603 (6th Cir. 2006). Thus, Rule 403 "ultimately calls for a weighing" of the probative value of the evidence against the dangers listed in the rule. Jones v. Wiseman, 838 F. App'x 942, 949 (6th Cir. 2020); see also United States v. Rey, 923 F.2d 1217, 1222 (6th Cir. 1991) (explaining that, in reviewing admissibility determinations under Rule 403, the reviewing court must view the evidence "in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect" to determine whether the evidence has an "undue tendency to suggest a decision on an improper basis").

Due to the parties' stipulations regarding the elements of the offense, the only real element for the jury to determine is whether Robinson knowingly possessed the firearm. Brandon will testify that Ares's actions indicate that the firearm in this case was reportedly discarded—and thus handled by a human—within four-and-a-half hours of the time Ares alerted to the firearm. Although that evidence does not directly peg Robinson as the handler of the firearm, the evidence makes that fact more probable than it would be without the testimony, as it means that the firearm

was handled and discarded within a timeframe that is arguably close in time to when Robinson passed through the yard. Therefore, the testimony is relevant.

As for Rule 403 concerns, the Government has submitted a revised opinion that has eliminated the issues raised by the Court at the second <u>Daubert</u> hearing, i.e., jury confusion if Brandon were to opine, as he had initially proposed to do, that the firearm had been "recently" discarded and that the scent was a "fresh" odor. Such qualitative language would be hopelessly ambiguous, opening up the possibility that jurors would not have a uniform understanding of what those terms meant. Framing the opinion in terms of a defined four-and-half hour period in which human handling took place is more definitive. This quantitative framing avoids ambiguity and the danger of confusing or misleading the jury.

### III. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Robinson's motion in limine to exclude the expert testimony of DPD K-9 Officer Steven Brandon (Dkt. 33).

SO ORDERED.

Dated: June 1, 2023   s/Mark A. Goldsmith
    Detroit, Michigan   MARK A. GOLDSMITH
        United States District Judge